FILED

04/02/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 5, 2019

## STATE OF TENNESSEE v. QUINTIN BRITTENUM

**Appeal from the Criminal Court for Shelby County**
No. 16-05713        W. Mark Ward, Judge

_____

### No. W2019-00521-CCA-R3-CD

_____

The Defendant-Appellant, Quintin Brittenum, was convicted by a Shelby County jury of rape of a child and two counts of aggravated sexual battery, for which he received an effective sentence of fifty-five years' imprisonment. Tenn. Code Ann. §§ 39-13-504, -522. In this appeal as of right, the Defendant's sole issue for our review is whether the evidence is sufficient to support each of his convictions. Upon our review, we affirm.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Phyllis L. Aluko, District Public Defender, and Barry W. Kuhn, Assistant Public Defender, for the Defendant-Appellant, Quintin Brittenum.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Devon D. Lepeard, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Over a period of several months in mid to late 2015, the Defendant began sexually abusing the seven and nine-year-old victims who lived with the Defendant's mother. After one incident in which the Defendant raped and sexually abused the victims, they reported the abuse to their grandmother, who told the victims' mother. The victims' mother immediately took the victims to the hospital and reported the abuse to the police. On September 29, 2016, a Shelby County Grand Jury returned an indictment against the Defendant charging rape of a child and two counts of aggravated sexual battery. The following proof was adduced at the trial that took place from June 26-28, 2018.

The victims' mother, L.T.,[1] testified that she had three children, one of whom died in a house fire on December 27, 2014. L.T.'s niece and nephew also died in the fire. After the fire, L.T. and her daughters, the victims, moved in with L.T.'s boyfriend, Demario Brittenum, and his grandmother. L.T. stated that she knew the Defendant by the name "Sam," rather than "Quintin." The Defendant's mother is Demario's[2] grandmother, and the Defendant is Demario's uncle. L.T. testified that she met the Defendant in June or July in 2015, when the Defendant came over to his mother's home to do work around the house. She said that, initially, the Defendant came over two to three times a month, but eventually he started coming every day. L.T. described the layout of Demario's grandmother's house, stating that her daughters, T.T. and Z.G., shared a room in the back of the house across from the bathroom. She said that she worked at Williams Sonoma, and T.T. and Z.G. went to school until 3:30 p.m. and daycare until 6:00 p.m. She said that T.T. and Z.G. rode the bus home from daycare, and Demario or his grandmother watched them until she got home from work. L.T. said she had no contact with the Defendant.

L.T. testified that she took T.T. and Z.G. to her mother's house on a weekend in December 2015. T.T. and Z.G. told their grandmother what the Defendant had done to them. Their grandmother told L.T., and she immediately took the victims to the hospital and called the police. L.T. said,

> [The victims] told me that [the Defendant] was touching on them and everything, and he showed them his body piercing, his penis. And he asked my oldest daughter, [Z.G.] to suck it, and she told him no. Then he was feeling on my baby daughter, and he rubbed his penis against her behind, is what she told me. And she said he was feeling on her private part and stuff, and also, my oldest daughter said he kissed her on the mouth and licked her down there in her private part.

L.T. stated that, in August 2015, the Defendant asked her if he could take the victims to McDonald's and buy them happy meals, and she told him no. She said the Defendant also brought candy to the victims.

On cross-examination, L.T. testified that the Defendant's son, Quintin Brittenum, Jr., was not living with Demario and his grandmother when L.T. and the victims moved in with them. L.T. said she had never discussed molestation with the victims or what to do if something happened to them. She said she told the police that the Defendant had

---

[1] It is the policy of this court to refer to minor victims and their family members by their initials.

[2] Because the Defendant and Demario Brittenum share a last name, we will refer to Demario by his first name. We intend no disrespect.

sexually abused the victims "four days in a row." After she took the victims to the hospital, L.T. gave a statement to the police, and the victims gave their statements as well. L.T. denied that the victims had been lying to her recently.

One of the victims, Z.G., testified that she was born on August 18, 2006. She said that, in 2015, she knew the Defendant as "Sam." In 2015, Z.G. was living with Demario, her mother's boyfriend, at his grandmother's house. Her mother and her sister, T.T., were also living there. She said, "What happened in 2015 was when I was up in my room, he came in, and he started touching me and stuff. And then he kissed me, and then he licked my middle part." She identified the Defendant as the man to whom she referred. Z.G. stated that she was nine years old when the Defendant first "started coming around the house fixing stuff." She said that this was when the Defendant started touching her.

Z.G. testified that she was in "the room beside the bathroom" the first time the Defendant touched her "in [her] middle part and stuff." She recognized that her "middle part" was her vagina. She said that the last time she remembered the Defendant touching her was in November 2015 after her sister, T.T., got in trouble on the bus. She said she went into her room with T.T. to change out of their school uniforms, and the Defendant came in the room, "[l]aid [her] on the floor, and then he licked [her] middle part." She said the Defendant closed the door, turned off the lights, and kissed her on her lips. The Defendant also took off Z.G.'s clothes. She remembered laying down on the floor next to T.T. She told the Defendant to stop. She stated that Demario's grandmother was in the living room when this happened, and Demario was outside. She tried to say something to Demario, but she could not because the Defendant was "holding [her] mouth." She believed that she was in the room with the Defendant for about an hour before he left.

Z.G. also testified that the Defendant "squeezed [her] butt" when she was in the restroom. She said that she told her mother about this, but no one believed her. She testified that the Defendant "tried to make [her] suck his middle part" in November, which was the same time that she was on the floor with her sister. She said the Defendant told her to "suck it." She said the Defendant tried to give her money and candy, but she did not take it. Z.G. stated that she did not tell anyone else what happened because she was scared of the Defendant and scared that people would not believe her.

On cross-examination, Z.G. testified that the Defendant got her and T.T. off the bus on the day that T.T. got in trouble. She said that was the first time that the Defendant had gotten her and T.T. off the bus. She said it was already dark outside when she got home that day. She stated that Demario's grandmother was asleep on the couch when she came inside, and Demario came inside the house one time to check on her. She also stated that her mother was home when she came out of her room after the Defendant did

this to her, and her mother came in her room after the Defendant left. She said that she told her mother about these incidents when they first started happening, but her mother did not believe her. Z.G. said that she, T.T., and their mother moved out of Demario's house after she told her mother about the last incident. She testified that her mother had never talked to her about "any of these kind of things" before.

The other victim, T.T., testified that she was born on March 24, 2008. She stated that she lived with her mother, Demario, Z.G., and her grandmother in May 2015. She also knew the Defendant as "Sam." T.T. said that she met the Defendant "[w]hen he came over to fix the plugs." She stated that in November 2015, she got in trouble on the bus, and the Defendant signed her and Z.G. off the bus that day. She and Z.G. went to their room to change clothes, and the Defendant walked in. T.T. testified that the Defendant then walked in and "rubbed up against [her] butt" with his hand. She said the Defendant also tried to kiss her. She said the Defendant turned off the lights, but he did not close the door. She also stated that the Defendant tried to make her "suck his middle part," and he tried to make her get on the floor. She said the Defendant had tried to make her "suck his middle part" before this incident. T.T. said Z.G. was holding her hand when they were laying on the floor. She tried to call out to Demario when he came inside the house, but she couldn't because the Defendant had his hand over her and Z.G.'s mouths. She said the Defendant eventually let them go, and she went into the living room and watched TV. She told her grandmother what happened a short time later. T.T. also testified that the Defendant had touched her middle part when she and Z.G. were in their room doing homework. She did not tell anyone at first because she was scared of the Defendant. T.T. also stated that the Defendant gave her money and candy.

On cross-examination, T.T. testified that, when she got in trouble for drawing on the seat on the school bus, her sister told her mother about it when she got off of work that day. She said that the Defendant was there when she and Z.G. got off the bus, while Demario was in "the other house." She said Demario's grandmother was in the living room watching TV when she came inside. T.T. testified that she told the police the same thing that she told the forensic interviewer, which was the same as what she was testifying to at trial.

Demario Brittenum testified that the Defendant was his uncle. He said he was living with his grandmother, his girlfriend, L.T., and her two children, T.T. and Z.G., between May and December 2015. Demario had lived at that address since 1989. He said when L.T., T.T., and Z.G. moved in, the Defendant had been coming around the house "maybe three times a month doing handy work for [his] grandmother." He said, "towards the end[,]" the Defendant started coming by the house "maybe every other day, if not every day." Demario received a call from L.T., "let[ting] [him] know that something was going on with the girls, and we needed to seek medical attention."

Demario testified that he did not actually see anything happen with the Defendant and the victims other than him "talking with them" and coming over more frequently after they moved in.

On cross-examination, Demario testified that he and his grandmother "rotated getting [T.T. and Z.G.] off the bus." He said that "no one ever knew" what was going on with the victims and the Defendant until L.T.'s mother called her and told her about it. He said L.T. asked him about that date, and he told her that he did not notice anything, and he would have stopped it if he had. He did not think the victims had been acting any differently, stating they were "just acting like children." Demario said he was sitting in the backyard with his friends on the day that T.T. got in trouble on the bus, and the Defendant got the victims off the bus. He said that the Defendant talked to the victims outside for "about two hours" after they got off the bus. He saw the Defendant in the room with the victims, but he did not see him doing anything, so Demario went back outside. When asked if the victims had not been "telling the truth on their mother," Demario said he could not answer that question truthfully. Demario had trouble remembering the exact dates when anything happened.

Investigator James Byars testified that he was employed with the Memphis Police Department (MPD) for 26 years and that in December 2015 through 2016, he was a Sergeant in the Special Victim's Unit. Investigator Byars was assigned the case involving T.T. and Z.G. on December 17, 2015. When he received the case, he was advised that the Defendant was the suspect. He identified Nathaniel Cleaves, the Defendant's half-brother, as the person who gave him the Defendant's name. Investigator Byars said that, as he developed the Defendant as a suspect, he spoke to L.T., Demario, and the Department of Children Services (DCS) case worker. Investigator Byars testified that he did not speak to the victims as it was MPD protocol for officers to speak to victims as little as possible.

On cross-examination, Investigator Byars said he took a statement from Demario over the phone, and, on December 30, 2015, he advised L.T. that he or DCS would be getting in touch with her to schedule forensic interviews. He interviewed L.T. on June 7, 2016. He said that he did not go to the hospital on the night that L.T. took the victims because it was not a "callout" for MPD. Investigator Byars was assigned the case the day after the victims went to the hospital. On redirect examination, Investigator Byars testified that neither L.T. nor Demario were uncooperative with the investigation, but it was difficult to get in touch with them based on "health issues and matters like that." He stated that many factors influenced how quickly a forensic interview could take place. Investigator Byars was assigned a DCS partner for this case, who reviewed T.T. and Z.G.'s forensic interviews.

Letitia Cole, an employee of the Memphis Child Advocacy Center (MCAC), testified that she "interview[s] children with allegations of sexual abuse and physical abuse." She interviewed T.T. at the MCAC on January 14, 2016, and the interview was videotaped. Cole turned this interview over to the State. Cole described how she conducted these interviews. The Defendant played the forensic interview of T.T. for the jury and introduced the video as an exhibit. Cole confirmed that T.T. disclosed in the interview that "someone…touched her butt."

On cross-examination, Cole testified that she conducts between 300 and 500 forensic interviews a year. She said that she commonly interviews siblings separately about the same types of events, and it is common to find inconsistencies in these statements. She said that T.T. "appear[ed] to be shutting down a little bit in responding to her questions" near the end of the interview, but she confirmed that this was common for a young child. Cole stated that she only knew "a little bit" about the case before conducting the interview. She also agreed that it is typical for children to disclose more information as time goes on from the incident; therefore, the forensic interviews do not always encompass everything that happened to the child. On redirect examination, Cole stated that T.T. did not appear nervous or afraid during her forensic interview and was "quite talkative." On recross-examination, Cole testified that T.T. disclosed two different instances of abuse. She confirmed that it was common for children to "confuse the exact timing of events" and "what happened which time."

Quintin Brittenum, Jr., testified that he lived in a cottage behind his grandmother's house in December, 2015. He said his "little girl's mom" lived in the cottage with him. The Defendant is Quintin, Jr.'s father. Quintin, Jr., stated that he knew T.T. and Z.G., but he "didn't care too much for them" because they beat up his dog and stole "little things" out of his house. Quintin, Jr., said that he was home on December 11, 2015, along with his little girl's mom, his grandmother, and Demario. He said L.T. was "in and out." He said he was not aware of any incidents between the victims and the Defendant, and no one told him anything about it that day. He stated that no one ever asked him if he had seen anything between the Defendant and the victims. Quintin, Jr., said that the Defendant came over to his grandmother's house two times a week, which was normal for him. He said he moved out the second week of January 2016, L.T. and the victims were still living there at that time, and he believed that they lived there until February or March 2016.

On cross-examination, Quintin, Jr. could not recall what day of the week December 11, 2015, fell on, but he asserted that he remembered that particular day because "it was basically like a normal day." He said he went to work, but he came home on his breaks to check on his "expecting mother." He believed that the Defendant "stopped by" that day. He described the Defendant's relationship with the victims as

"almost like a father, overseer[.]" He said that it was not unusual for the Defendant to be alone with the victims or to bring them candy. He said that he did not see the Defendant get the victims off of the bus on December 11, 2015, but he agreed that this could have happened. He said he did not know L.T. very well because they "kind of bump[ed] heads."

The trial court gave the following instructions regarding election of offenses:

The State has offered proof in its case in chief of more than one act allegedly committed by the [D]efendant in which the State alleges constitutes an element of the offenses as charged in the Indictment. To ensure a unanimous verdict, the law requires the State to elect which alleged act testified to the State is relied upon for your consideration in deciding whether or not the [D]efendant is guilty of a charged offense or a lesser included offense.

The fact that the Court has required the State to elect, does not mean that the Court has found that the State has carried its burden of proving those allegations beyond a reasonable doubt. That is for your determination. In this case with regard to Count One, the State has elected to submit for your consideration the alleged act of the [D]efendant licking the vagina of [Z.G.] while she was lying on the floor of her bedroom, occurring on the same day that her sister got in trouble while riding the bus, and which was described by her as the "last time" such an act took place.

Members of the jury, you're to consider only this alleged act in deciding whether or not the [D]efendant has been proven guilty beyond a reasonable doubt of the it [sic] offenses charged and included in Count One of the Indictment.

With regard to Count Two, the State has elected to submit for your consideration the alleged act of the [D]efendant touching the butt of [Z.G.] while she was in the bathroom. Members of the jury, you are to consider only this alleged act in deciding whether or not the [D]efendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in Count Two of the Indictment.

With regard to Count Three[,] the State has elected to submit for your consideration of the alleged act of the [D]efendant rubbing the butt of [T.T.] with his hand while she was in her bedroom, what she described occurred on the same day she got in trouble while riding the bus. Members

- 7 -

of the jury, you are to consider only this alleged act in deciding whether or not the [D]efendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in Count Three of the Indictment.

Following deliberations, the jury returned a verdict of guilty on all three counts. At the September 21, 2018 sentencing hearing, the Defendant's presentence report and a certified copy of the Defendant's 1994 conviction for aggravated sexual battery were entered as exhibits. The trial court sentenced the Defendant as a Range I, standard offender to thirty-five years for Count 1, ten years for Count 2, and ten years for Count 3, to be served consecutively for a total effective sentence of fifty-five years. The Defendant filed a motion for new trial on November 6, 2018, and an amended motion for new trial on December 19, 2018.[3] After a hearing, the trial court denied the motion on February 22, 2019. On the same day, the Defendant's trial counsel filed a motion to withdraw, and the Shelby County Public Defender's Office was appointed to handle the Defendant's appeal. The Defendant filed his notice of appeal on March 22, 2019.

## ANALYSIS

On appeal, the Defendant argues that the evidence presented at trial was insufficient to convict him of rape of a child and two counts of aggravated sexual battery. The State responds that the evidence was more than sufficient to support each of the Defendant's convictions. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

---

[3] The record shows that the judgment on Count 1 was not entered until November 30, 2018, making the amended motion for new trial timely.

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**Rape of a Child.** The Defendant argues that because victim, Z.G., "[did] not describe any penetration that took place[,]" the evidence is insufficient to convict him of rape of a child. The State asserts that the jury "could reasonably conclude that Defendant intentionally, knowingly, or recklessly performed cunnilingus on [Z.G.]." Rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's or any other person's body, but the emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7). "'Cunnilingus' means a sex act accomplished by 'placing the mouth or tongue on or in the vagina of another.'" State v. Bardin, No. W2017-02506-CCA-R3-CD, 2019 WL 458917, at *3 (Tenn. Crim. App. Feb. 5, 2019) (citing State v. Hoyt, 928 S.W.2d 935, 942) (Tenn Crim. App. Dec. 13, 1995)), perm. app. denied (Tenn. June 11, 2019). "Penetration of the vagina by the mouth or tongue is not required for a sexual act to constitute cunnilingus." Id. (internal citations omitted).

Viewing the evidence in the light most favorable to the State, the eleven-year-old victim, Z.G., testified that the Defendant came into her room when she was changing clothes, turned off the lights, laid her on the floor, and licked her vagina, which she referred to as her "middle part." The testimony of the victim, standing alone, is more than sufficient for a rational juror to conclude that the Defendant committed rape of a child. We observe here that the Defendant does not dispute the testimony of the victim

on appeal. Instead, the Defendant argues that "licking" does not constitute penetration under our law. In a footnote, the Defendant cites State v. Hoyt, 928 S.W.2d 935, 942 (Tenn. Crim. App. Dec. 13, 1995), and the two unpublished cases upon which it relies, and argues that "these cases should not be relied upon because the cases attempt to re-write the statute." We disagree. This court has repeatedly rejected this argument and stated, "[w]hile touching alone without intrusion would not constitute penetration under our statute, licking does. Penetration includes cunnilingus which has been defined by our courts as oral contact with the female genitals. Oral penetration into the vagina is not required." State v. Jaime F. Zarate, No. E2017-02553-CCA-R3-CD, 2019 WL 2912564, at *9 (Tenn. Crim. App. July 5, 2019), perm. appeal denied (Dec. 5, 2019) (quoting State v. Reginald L. Parker, No. 02C01-9306-CR-00130, 1994 WL 716272, at *2 (Tenn. Crim. App. Dec. 28, 1994)(internal quotations and citations omitted) and citing State v. Troy Love, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *15 (Tenn. Crim. App. Mar. 21, 2017)). Accordingly, the Defendant is not entitled to relief.

**Aggravated Sexual Battery.** The Defendant argues that the evidence was insufficient to convict him of aggravated sexual battery for "touching the butt of [Z.G.] while she was in the bathroom" in count two. He asserts that no testimony was presented at trial to show that the Defendant touched the victim's butt for sexual arousal or gratification, but that "[i]t may have just as easily been interpreted as a friendly gesture." The Defendant likewise argues that the evidence was insufficient to convict him of aggravated sexual battery for "rubbing the butt of [T.T.] with his hand while she was in her bedroom which she described as occurring on the same day that she got in trouble while riding the bus" in count three. Again, the Defendant asserts that this may have been a "friendly pat[,]" and "there is nothing to show that it was done for sexual arousal or gratification." In response, the State contends that the evidence presented at trial established the essential elements of aggravated sexual battery for both counts.

As relevant here, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and the victim is less than thirteen (13) years of age. Tenn. Code Ann. § 39-13-504. "Sexual contact" includes:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Tenn. Code Ann. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock, or breast of a human being." Tenn. Code. Ann. § 39-13-501(2).

- 10 -

Viewing the evidence in the light most favorable to the State, Z.G., the eleven-year-old victim testified that the Defendant "squeezed [her] butt" when she was in the bathroom. The ten-year-old victim, T.T., testified that the Defendant "rubbed up against her butt" with his hand, tried to kiss her, and tried to make her suck his "middle part." Once again, the Defendant does not dispute the testimony of the victims for these two counts. Instead, he claims that his touching could have been construed innocently. However, this court has previously pointed out that there is no requirement within the statute that the sexual contact itself be for sexual arousal or gratification. State v. Roy Chisenhall, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App. June 3, 2004). The statute merely requires touching that can be "<u>reasonably construed</u> as being for the purpose of sexual arousal or gratification." <u>Id.</u> (emphasis in original) (citing Tenn. Code Ann. §39-13-501(6); State v. Steven Webster, No. W1999-00293-CCA-R3-CD, 1999 WL 1097820, at *1-*2 (Tenn. Crim. App. Nov. 22, 1999), <u>perm. to appeal denied</u> (Tenn. 2000)). From the circumstances surrounding the touching of both victims, a rational jury could have concluded that the touching of both victims was for sexual arousal or gratification. Accordingly, the evidence is sufficient to support each conviction of aggravated sexual battery, and the Defendant is not entitled to relief.

## <u>CONCLUSION</u>

Based on the above reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

- 11 -